UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PI TOWER DEVELOPMENT, LLC,

      Plaintiff,

                                        Case No. 20-cv-12280
                                        Hon. Matthew F. Leitman

v.

CHARTER TOWNSHIP OF CHESTERFIELD,

      Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 17)**

No one wants a wireless communications tower placed in his neighborhood. But everyone wants – and our economy depends in large part upon – consistently reliable and affordable wireless service. In 1996, Congress sought to balance these competing interests in the Telecommunications Act of 1996, 47 U.S.C. § 332 *et seq.* (the "Act"). The Act aims to "secure lower prices and higher quality services for American telecommunications consumers," Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, while largely preserving "the authority" of local governments "over decisions regarding the placement, construction, and modifications of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). Congress struck this balance, in part, by requiring that "[a]ny decision by a State or local government … to deny a request to place, construct, or modify personal

wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

The Act's "substantial evidence" requirement has generated a significant amount of federal litigation. Indeed, the federal reporters are replete with cases in which wireless service providers have claimed that decisions denying their applications to construct towers have not been supported by substantial evidence.

This is another such case, but it is an unusual one. In most of these cases, a wireless service provider first secures the right to construct a tower on private land and then seeks permission from a local government to build the tower. Under these circumstances, the local government's first meaningful consideration of whether to permit construction of a tower on the proposed site comes when the government is approached by the provider. In sharp contrast, in this case, Plaintiff PI Tower Development, LLC ("PI") worked cooperatively with employees of Defendant Chesterfield Charter Township, Michigan (the "Township") to find a suitable location in the Township for construction of a tower. That location was on Township-owned property. After PI and Township staff agreed upon the site for the tower, the Township Board (the "Board") – the Township's elected governing body – approved a lease that granted PI the right to construct a tower on the property.

As specifically required by the Township's ordinance concerning wireless communications towers, the lease required PI to obtain a special use land permit (an

"SLP") before constructing its tower.  PI applied for an SLP, and as part of that process, the Township's outside professional planning consultants concluded that PI's proposed construction plan for its tower was in substantial compliance with the Township's zoning ordinances.  The Township's outside civil engineering consultants likewise recommended approval of PI's proposed tower.

But the Township's Zoning Board of Appeals (the "ZBA") nonetheless denied PI's application for an SLP.  Even though the Board had deemed the Township-owned property suitable for construction of a tower, the Township's planning consultants had concluded that PI's plan was in substantial compliance with the applicable zoning ordinances, and the Township's engineering consultants had recommended the tower's approval, the ZBA decided that the property was not an appropriate site for construction of a tower.  In this action, PI alleges, among other things, that that decision was not supported by substantial evidence.  The Court agrees.

As explained below, the ZBA's decision was not supported by substantial evidence because, among other things: (1) it rested upon a misunderstanding of, and/or disagreement with, the Township's zoning ordinances; (2) its underlying reasoning is inconsistent with the zoning ordinances; and (3) it cannot reasonably be reconciled with the determinations by the Board and the Township's professional consultants that the Township-owned property chosen by PI (in conjunction with

Township staff) was suitable for the construction of a wireless communications tower. Accordingly, the Court **GRANTS** summary judgment in favor of PI on its claim that the decision denying its application to construct a wireless communications tower was not supported by substantial evidence.

## I

## A

The Township is located in Macomb County, Michigan. The Board is the Township's governing body. It is comprised of seven elected officials: four "Trustees," the Township Treasurer, the Township Supervisor, and the Township Clerk. *See* https://www.chesterfieldtwp.org/242/Elected-Officials. The Board, among other things, has the authority to adopt ordinances that govern activity in the Township. (*See*, *e.g.*, Admin. R., ECF No. 14-3, PageID.351, certifying that the Board adopted revision to Township zoning ordinance.)

In addition to the elected Board, the Township has several administrative bodies that handle Township business. One such body is the Township Planning Commission. The Planning Commission considers applications for land uses throughout the Township. It "consist[s] of nine members appointed by the [Board], based on a recommendation from the Township Supervisor." Ordinance § 2-128(a). One of the nine appointees to the Planning Commission is a member of the Board,

4

whom the Board designates as a "liaison[]" between the Planning Commission and the Board. Ordinance § 2-128(c).

The ZBA is another Township administrative body.  Among other tasks, the ZBA hears appeals from Planning Commission rulings. *See*, *e.g.*, Ordinance § 76-482(C).  The ZBA is comprised of: (1) a member of the Planning Commission, (2), "a member of the [Board], appointed by the [Board]," and (3) five of the Township's citizens "selected and appointed by the [Board]." Ordinance, Chapter 76, Article 7, Section 7.2(A)(1-3).

## B

The location and construction of wireless communication towers within the Township is governed by Ordinance § 76-530 (the "Tower Ordinance"). (*See* Admin. R., ECF No. 14-3, PageID.343-356.[1])  The Tower Ordinance provides that

---

[1] As described in more detail below, the Board amended the Tower Ordinance in September 2019.  The administrative record before the Court does not contain a single, unified version of the entire Tower Ordinance as it existed following the September 2019 amendment.  Instead, the record includes (1) a complete version of the version of the Tower Ordinance that was in place prior to the September 2019 amendment (*see* Admin. R., ECF No. 14-3, PageID.353-356) and (2) "Ordinance 177," which includes only the amendments to the Tower Ordinance that the Board passed in September 2019 (*see id.*, PageID.343-352).  To determine the content of the Tower Ordinance as it existed after the 2019 amendment from the materials in the record, one must begin with original version in the record and then replace the sections of that version with the sections that were added/amended by the 2019 amendment.  For the reader's convenience, a complete, unified copy of the Tower Ordinance following the 2019 amendments may be found on the Township's website: https://www.chesterfieldtwp.org/DocumentCenter/View/3833/ at pages 192-195.

"[i]t is the general purpose and intent of the [T]ownship to provide authorization for wireless communication facilities and to retain the integrity of neighborhoods and the character, property values and aesthetic quality of the neighborhoods and the community at large. It is the intent of the [T]ownship to balance these potentially competing interests and to fully exercise the authority granted by law relative to the placement, construction and modification of wireless communication facilities." Tower Ordinance § 76-530(a) (Admin. R., ECF No. 14-3, PageID.353). The Tower Ordinance also provides that the construction of such towers is considered a special land use subject to special land use approval: "It is further the purpose and intent of this section to: Establish predetermined districts or zones of the number, shape and in the location considered best for the establishment of wireless communication facilities as special land uses, subject to conformance with applicable standards." Tower Ordinance § 76-530(a)(1) (Admin. R., ECF No. 14-3, PageID.353). The Tower Ordinance further "recognize[s] that reasonable operation of a wireless communication system may require the establishment of a facility in a location which is not within one of the predetermined districts or zones. In such case, it has been determined that there will be greater adverse impact upon the neighborhood and/or area, and, consequently, more stringent standards and conditions should apply to the review, approval and use of such a facility." Tower Ordinance § 76-530(a)(2) (Admin. R., ECF No. 14-3, PageID.353).

6

Until 2019, the section of the Tower Ordinance concerning where wireless communications towers could be located provided as follows:

> Towers may be located in the M- 1, M- 2 and RD[2] districts after special land use approval, and provided the location of such facilities do not represent a hazard to the use and/or development of other uses on the site and in the area. Tower locations within a commercial district may be considered as a special land use when they are located adjacent to an industrial district or an unbuildable area, such as a wetland or floodplain, or area so located on the commercial site as to not adversely affect the commercial development area or any neighboring residential areas. The development of new towers is specifically prohibited in all other districts in the Township. The Township strongly encourages the development of necessary towers on suitable Township-owned property. Consultation with the Township Planning Department with regard to Township property locations shall be accomplished prior to submitting an application.

*See* Tower Ordinance § 76-530(b)(4)(a) (repealed September 2019) (Admin. R., ECF No. 14-3, PageID.355.)

As the Township's attorney explained to the Court during an on-the-record status conference held on October 15, 2021, this section of the Tower Ordinance created some confusion about whether a tower could be built on Township-owned property in a residential district. Therefore, as counsel further explained, the Board

---

[2] Counsel for the Township informed the Court during a status conference that the reference to the "RD" district in the Tower Ordinance is a typographical error, and that the reference should be to the "RT" or "resource technology" district. The repeated references throughout the administrative record to the "RD" or "recreation district" appear to repeat this error.

amended this section of the Tower Ordinance in September 2019 to clarify that a tower *could* be built on Township-owned property in *any* district, *including* a residential district. *See* Tower Ordinance § 76-530(b)(8) (Admin. R., ECF No. 14-3, PageID.345-346).  The amended section of the Tower Ordinance – that was in effect when PI sought permission to construct its tower – provides as follows:

> Towers may be located in the M- 1, M- 2 and RD districts after special land use approval, and provided the location of such facilities do not represent a hazard to the use and/ or development of other uses on the site and in the area. Tower locations within a commercial district may be considered as a special land use when they are located adjacent to an industrial district or an unbuildable area, such as a wetland or floodplain, or area so located on the commercial site as to not adversely affect the commercial development area or any neighboring residential areas. The development of new towers is specifically prohibited in all other districts in the Township. *The provisions of this chapter are not intended to and shall not be interpreted to prohibit or to have the effect or prohibiting wireless communications services.* The Township strongly encourages the development of necessary towers on suitable Township-owned property, *and the Township has authority to approve a new tower on Township property, regardless of the zoning district.* Consultation with the Township Planning Department with regard to Township property locations shall be accomplished prior to submitting an application.

(*Id.*; amendments to Tower Ordinance emphasized in italics) (Admin. R., ECF No. 14-3, PageID.345-346.)

**C**

As the section of the Tower Ordinance quoted above makes clear, a wireless service provider who wishes to construct a tower anywhere in the Township must obtain an SLP. *See* Tower Ordinance §§ 76-530(a)(1); 76-530(b)(8) (Admin. R., ECF No. 14-3, PageID.353, 345-346.)   The SLP process is governed by the Township's "Special Land Use" ordinance (the "SLP Ordinance"). *See* SLP Ordinance § 76-482.[3]  Pursuant to the SLP Ordinance, an applicant seeking an SLP must "outline in writing how a subject project complies with" certain enumerated "standards." SLP Ordinance § 76-482(A).  That application is then reviewed by the Township Planning Commission. *See id.*   Before the Planning Commission may approve the use, it "must find" that the "standards" included in the SLP Ordinance are met. *Id.*  Those standards are as follows:

> 1. The proposed use shall be of such location, size and character that it will be in harmony with the appropriate and orderly development of the surrounding neighborhood and applicable regulations of the zoning district in which it is to be located.
>
> 2.  The proposed use shall be of a nature that will make vehicular and pedestrian traffic no more hazardous than is normal for the district involved, taking into consideration vehicular turning movements in relation to routes of traffic flow, proximity and relationship to intersections, adequacy of sight distances location and access of off street parking and provisions for pedestrian traffic, with

---

[3] The full text of the SLP ordinance can be found on the Township's website: https://www.chesterfieldtwp.org/DocumentCenter/View/3833/ at pages 326-328.

particular attention to minimizing pedestrian-vehicle conflicts.

3. The proposed use shall be designed as to the location, size, intensity, site layout and periods of operation of any such proposed use to eliminate any possible nuisance emanating therefrom which might be noxious to the occupants of any other nearby uses permitted, whether by reason of dust, noise, fumes, vibration, smoke or lights.

4. The proposed use shall be such that the proposed location and height of buildings or structures and location, nature and height of walls, fences and landscaping will not interfere with or discourage the appropriate development and use of adjacent land and buildings or unreasonably affect their value.

5. The proposed use shall relate harmoniously with the physical and economic aspects of adjacent land uses as regards prevailing shopping habits, convenience of access by prospective patrons, continuity of development, and need for particular services and facilities in specific areas of the township.

6. The proposed use is necessary for the public convenience at the proposed location.

7. The proposed use is so designated, located, planned and to be operated that the public health, safety and welfare will be protected.

8. The proposed use shall not cause substantial injury to the value of other property in the vicinity in which it is to be located and will not be detrimental to existing and/or other permitted land uses in the zoning district.

SLP Ordinance § 76-482(B)(1)-(8).   If the Planning Commission denies an application for an SLP, an applicant may appeal that ruling to the Township ZBA.

*See* SLP Ordinance § 76-482(C).  "The [ZBA] shall review such decision *de novo* with reference to the standards for special land uses" listed in the SLP Ordinance. *Id.*

## D

PI is a "full-service nationwide tower development and co-location service provider for the United States wireless industry.  [It] builds wireless communications facilities and towers to suit wireless communication service provider's needs and manages a portfolio of existing towers and facilities." (Compl. at ¶11, ECF No. 1, PageID.5.)

In 2017, PI identified a significant gap in wireless phone service in the Township.  It then set out to identify a location in the Township on which to build a wireless communications tower that could alleviate that gap.  As part of that process, PI worked with Township employees to identify an appropriate place in the Township to construct the tower. (*See* Admin. R., ECF No. 14-13, PageID.647-648.) PI says that it consulted with both the Township Planning Department and Emergency Services Department and that, together, "they determined that the best location" for the tower would be on a parcel of Township-owned property located at

48461 Jefferson Avenue (the "Jefferson Avenue Property").[4] (*Id.*)  The Jefferson Avenue Property is located in a residential district.

Once PI and Township employees identified the Jefferson Avenue Property as the best location for PI's tower, PI and the Township's attorney began negotiating a ground lease for the portion of that property on which the tower would be built (the "Lease").[5] (*See id.*)  Eventually, the parties agreed on the terms of the Lease. (*See* Lease, ECF No. 17-2.)  The Lease described the leased premises as a "60' x 60' parcel of land" located at the "physical address" of the Jefferson Avenue Property: "48461 Jefferson Avenue, Chesterfield Township, MI 48047." (*Id.*, PageID.745.)  In addition, the Lease depicted the precise location on that property where PI would build a "Center 110' Monopole":

---

[4] In this action, the Township has not disputed PI's contention that it worked with Township employees and departments to determine that the Jefferson Avenue Property was the best location to build the tower.

[5] The Lease is not included in the administrative record.  However, the administrative record includes repeated references to the Lease, and the administrative record further reflects that all of the relevant Township decision makers were aware of the Lease and understood that the Lease concerned PI's right to build a wireless communications tower on the Jefferson Avenue Property.



(*Id.*, PageID.746.)

The Lease also required PI to "apply to the [Township] Planning Commission for site plan approval in accordance with Township Zoning Ordinance." (*Id.* at ¶4, PageID.735.)  But it simultaneously required the Township to "cooperate with [PI] in obtaining … all licenses and permits required for [PI's] use" of the Jefferson Avenue Property. (*Id.*)

The Lease was presented to the Board on July 23, 2019. (*See* Bd. Mtg. Minutes, ECF No. 17-3.)  The Board approved the Lease unanimously. (*See id.*, PageID.756.)

13

**E**

After the Board approved the Lease, PI applied to the Planning Commission for an SLP.  PI's SLP application was placed on the agenda for the Planning Commission's January 21, 2020, meeting. (*See* Admin. R., ECF No. 14-4.)  In advance of that meeting, several documents were submitted to the Planning Commission for its review.  These documents included:

- A "Site Plan and Special Land Use Review" from Township planning consultants Matt Wojciechowski and Rod Arroyo. (*See* Admin. R., ECF No. 14-3, PageID.339-342.)  In that review, Wojciechowski and Arroyo acknowledged that PI's proposed tower was "considered a special land use as regulated by the zoning ordinance." (*Id.*, PageID.339.)  They then advised that the tower was "in substantial compliance with the [Township's] zoning ordinance standards." (*Id.*, PageID.342.)

- A site plan review from the Township's outside civil engineering consultants. (*See id.*, PageID.338.)  The engineering consultants "recommend[ed] approval" of the proposed tower so long as PI added to its site plan information concerning the location and depth of a sanitary sewer. (*Id.*)

- An RF propagation map and letter of support from AT&T that said PI's proposed tower was "needed to improve signal strength for better in-car and in-building wireless service" for residents in the area surrounding the proposed tower. (*Id.*, PageID.359-364.); and

- A letter stating that the Office of the Macomb County Works Commissioner "has reviewed the preliminary plan" submitted by PI and had "no objection" to PI's proposed "land use." (*Id.*, PageID.332.)

The Planning Commission also received several letters from residents concerned about the construction of the tower. (*See id.*, PageID.365-407.)  Township residents raised concerns about the tower's aesthetics, about the impact the tower

14

would have on property values, and about whether the tower would cause health concerns for nearby residents. (*See id.*)

The Planning Commission first took up PI's application at its January 21, 2020, meeting.  Arroyo, one of the Township's planning consultants, spoke first.  He told the Commission that PI had "provided" all of the required "documentation," and he opined that PI's application "was in substantial compliance" with the Township's zoning ordinances. (Admin. R., ECF No. 14-5, PageID.412.)

A representative of PI, Fred Lauer, spoke next.  He told the Commission that PI had worked for three years to find suitable location in the Township that could alleviate the gap in wireless phone service that existed.  He also said that construction of the proposed tower would allow three different wireless phone carriers to increase service in the area. (*See id.*, PageID.412-413.)  He further explained that PI had negotiated the Lease with the Township's attorney and that the Lease was "approved and signed after [B]oard approval by the [T]ownship supervisor." (*Id.*, PageID.413.)

Several residents then addressed the Planning Commission.  The majority of those individuals opposed construction of the tower in a residential district. (*See id.*, PageID.413-415.)  In response, Lauer explained that "there were very few properties within the search area that would provide [the] coverage necessary and fit within the law that is provided in the [T]ownship ordinance[s]." (*Id.*, PageID.415.)  He said that PI "looked at all [T]ownship owned properties and any other property that was

15

appropriate per the [Tower O]rdinance," considered the Jefferson Avenue Property and "two others," and "rejected" the other two properties "because they did not meet the coverage area that [PI was] looking for." (*Id.*)

After the residents spoke, Planning Commission member David Joseph – who is also an elected member of the Board – raised concerns about whether the Board should have entered into the Lease. He worried that the Board had approved the Lease "without feedback from the residents" as to whether "it was a good idea to put the tower near the residents." (*Id.*, PageID.417.) Joseph expressed a desire to "go back to my fellow [B]oard members and ask them that we collectively as a [B]oard take a look at whether or not we are handling [the Jefferson Avenue Property] that belong[s] to the people in a proper way." (*Id.*)

Joseph then made a motion to table consideration of PI's SLP application "to afford the [B]oard an opportunity to weigh in on this again." (*Id.*, PageID.419.) In support of his motion, Joseph said that the Board should "reconsider" its decision to approve the Lease because the Board "got it wrong." (*Id.*) The Planning Commission unanimously approved Joseph's motion to table PI's application and to send the matter back to the Board. (*See id.*)

## F

The Board again considered the Lease at its February 11, 2020, meeting. According to Joseph, during that meeting, the Board received a briefing from its

attorneys and engaged in "lots of debate" over the Lease – so much debate that the meeting "lasted [until] well after midnight." (Admin. R., ECF No. 14-8, PageID.451.)  At the conclusion of debate, and after the Board had the opportunity to "hear from [its] residents," Joseph made a formal motion to rescind the Lease. (*Id.*)  The Board rejected that motion in a 4-3 vote. (*See id.*, PageID.451-452.)  The Lease thus remained in place.

**G**

PI's SLP application then came back before the Planning Commission during its February 2020 meeting.  At that meeting, PI again explained that it had been working with the Township's Planning Department for three years to find a suitable location for the tower, and PI said that its proposal complied with all applicable Township ordinances. (*See id.*, PageID.444-445.)   Representatives from both Verizon and AT&T were also present to explain how the proposed tower would alleviate the identified gap in wireless phone coverage. (*See id.*, PageID.446-447.)

At the conclusion of PI's presentation, Joseph made a motion to deny PI's application. (*See id.*, PageID.454.)  He argued that "the Township [B]oard violated its own rules [] in regards to the [Lease]." (*Id.*, PageID.454.)  He then urged the Planning Commission to "look at why we would not allow a tower in a residential neighborhood." (*Id.*, PageID.454.)  He insisted that the tower "does not belong in a residential neighborhood," and he said "the fact that it's on the other side of the fence

17

on township-owned property doesn't exclude people evaluating that in [their] deliberations." (*Id.*, PageID.466.)   Finally, he argued that PI had not "me[t] [its] burden" under the SLP Ordinance to show that the tower would "not interfere or discourage development and use of adjust land" or "unreasonably affect the[] value" of surrounding homes. (*Id.*, PageID.452.)

The Planning Commission then voted on Joseph's motion.   It approved the motion 5-3 and denied PI's SLP application. (*See id.*, PageID.466-467.)

### H

PI appealed the Planning Commission's decision to the ZBA.   PI presented to the ZBA many of the same materials that it had provided the Planning Commission, including RF propagation maps from AT&T and Verizon establishing the need for the tower and the summary from the Township's planning consultants that concluded PI had substantially complied with the Township's zoning ordinances. (*See* Admin. R., ECF No. 14-11, PageID.532-537, 558-559, 594-597.)

The ZBA considered PI's appeal at its July 8, 2020, meeting. (*See* Admin. R., ECF No. 14-13.)   At that meeting, PI asserted that the Planning Commission erred when it determined that PI's proposed tower was not in "harmony" with the surrounding properties and would be "injurious" to those properties. (*Id.*, PageID.674.)   PI pointed out, for example, that the Township's own planning consultants had concluded the opposite and determined that PI had fully complied

with the Township's zoning ordinances. (*See id*., PageID.647.)  PI then explained

how it worked with the City Planning Department and Emergency Services

Department to find the Jefferson Avenue Property and how they collectively

determined that property was the most appropriate location for the proposed tower.

(*See id.*, PageID.648.)

At the conclusion of debate over PI's appeal, ZBA board member Hank

Anderson – who is also an elected member of the Board – made a motion to deny

the appeal. (*See id.*, PageID.650.)  The motion stated that "[r]ead in its entirety," the

2019 amendment to the Tower Ordinance (discussed above) "clearly did not

envision the location of wireless communication towers in residential districts,

whether the property is privately or [T]ownship owned." (*Id.*, PageID.651.)  The

motion further explained that:

> [T]he zoning ordinance amendment in 2019 which
> encourages cell towers on suitable [T]ownship owned
> property [was] not consistent with the zoning ordinance
> restriction of such facilities to light and general
> manufacturing districts, commercial districts, and the
> recreation district.  The zoning ordinance amendment was
> not intended to encourage cell tower facilities in
> residential zones.   The amendment was simply a
> recognition that certain township owned properties may be
> considered when the property is not located in
> manufacturing, commercial, and recreational areas.

(*Id.*, PageID.651-652.)  Finally, the motion stated that "the proposed cell tower

facilities are not of such location, size or character that they will be in harmony with

the appropriate and orderly development of the surrounding residential neighborhood." (*Id.*, PageID.652.)  (The full verbatim text of Anderson's motion is set forth and addressed in detail in Sections (IV)(B)(2)(a)-(c) below.)

The ZBA approved Anderson's motion 4-2 with one abstention. (*See id.*)  By that vote, the ZBA upheld the Planning Commission's denial of PI's SLP application.

## II

PI filed this action on August 21, 2020. (*See* Compl., ECF No. 1.)  Relevant to the current motion, PI claims that "the Township violated the [Act]" in three ways: (1) the Township's decision denying the SLP were not supported by substantial evidence; (2) the Township's reasons for denying the SLP were not contained in a "written record;" and (3) the Township's denial of the SLP amounted to "an actual or effective prohibition of the provision of wireless communication services" in the area to be serviced by the proposed tower. (*Id.* at Counts I-II, PageID.22-25.)  PI also claims that the Township's denial of the SLP has prevented it from beginning construction on its tower, and PI requests an equitable extension of the due diligence period called for in the Lease. (*See id.* at Count V, PageID.29-31.)  PI asks the Court to:

> A. Compel the Township by affirmative injunction to grant approval of Plaintiffs' SL[P] application and site plan and to approve the three proposed wireless carriers for co-location on the Propose Tower;

B. Compel the Township by affirmative injunction to issue all permits and approvals necessary for PI to construct and operate the Proposed Tower on the Property as proposed by PI's in its SL[P] application and site plan;

C. Enter an injunction preventing the Township from interfering with PI's use of the Property for the Proposed Tower as set forth in PI's SL[P] application and site plan;

D. Declare that the Township's denial of PI's SL[P] application and site plan was not supported by substantial evidence in a written record as required by the Act;

E. Declare that the Township violated the Act by denying PI's SL[P] application and site plan;

F. Declare that Township's wireless communications ordinance, on its face and/or in its application to PI, violates the Act by effectively prohibiting the provision of personal wireless services in the area of the Gap;

G. Declare that the Township violated the Federal and/or Michigan Constitutions by denying PI's SLU application and site plan;

H. Award reasonable attorney fees, costs, and expenses allowed by law, including but not limited to those specifically provided for by 42 U.S.C. §1983 and §1988; [and]

I. Declare that the Initial Due Diligence Period and the Rent Commencement Date provided in the Ground Lease Agreement have been extended by no less than 104 days and rental payments are not currently due.

(*Id.*, PageID.32-33.)

PI filed a motion for partial summary judgment on April 8, 2021. (*See* Mot., ECF No 17.)  In its motion, PI seeks much of the relief it asked for in its Complaint,

such as a declaration "that the Township violated the Act by denying PI's SLP application" and an order compelling the Township "to issue all permits and approvals necessary for PI to construct and operate" its proposed tower. (*Id.*, PageID.688.)  PI also asks the Court to "equitably extend" the due diligence period described in the Lease. (*Id.*, PageID.689.)

The Court held a video hearing on the motion on August 16, 2021.  It also held a video status conference with counsel on October 15, 2021, where it asked counsel additional questions pertinent to the motion.

## III

PI has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.  Summary judgment is not appropriate when "the

22

evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52.

## IV

### A

The Act provides that "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with [the Act] may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v). During the video hearing before the Court, the parties agreed that the "final action" at issue here is the ZBA's decision to uphold the denial of PI's SLP application.

The Court's review of the ZBA's decision is governed by 47 U.S.C. § 332(c)(7). That provision states that "[e]xcept as provided in this paragraph, nothing in [the Act] shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). But it then states that (1) "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof – shall not prohibit or have the effect of prohibiting the provision of personal wireless services" and (2) "[a]ny decision by a State or local

government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. §§ 332(c)(7)(B)(i)(II) and (iii). This provision "is a deliberate compromise between two competing aims— to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *New Par v. City of Saginaw*, 301 F.3d 390, 394 (6th Cir. 2002).

## B

PI argues that the ZBA's decision to uphold the denial of its SLP application violated the Act because it was not supported by "substantial evidence." The Court agrees.[6]

## 1

"When drafting [the Act], Congress used the 'substantial evidence' standard, well understood in appellate review of administrative proceedings but a novel concern for federal courts reviewing the proceedings of local zoning boards." *T-Mobile Cent., LLC v. Charter Tp. of West Bloomfield*, 691 F.3d 794, 798 (6th Cir.

---

[6] Because the Court concludes that the ZBA's reasons for upholding the denial of PI's SLP application were not supported by substantial evidence, the Court need not address PI's alternative bases for relief: that the ZBA's reasons were not in writing and that the ZBA's denial had the effect of prohibiting the provision of personal wireless services in the area to be serviced by the proposed tower in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

2012).  The Sixth Circuit, "like all other [courts], has found that the 'substantial evidence standard of § 332 is the traditional standard employed by the courts for review of agency action.'" *Id.* (quoting *Telespectrum, Inc. v. Pub. Serv. Comm'n of Kentucky*, 227 F.3d 414, 423 (6th Cir. 2000)).  The Sixth Circuit has explained how courts should apply the Act's "substantial evidence" standard as follows:

> [T]his court's precedents do not address "substantial evidence" of *what?* In other words, if there is a denial of an application to build a wireless facility, what must the substantial evidence in the record show in order to avoid a violation of § 332(c)(7)(B)(iii)? The Ninth Circuit—in an opinion by Judge Cudahy sitting by designation from the Seventh Circuit—explained that this standard "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable state and local law." *MetroPCS, Inc. v. City & Cnty. of San Francisco,* 400 F.3d 715, 723–24 (9th Cir.2005). On this analysis, § 332 does not introduce a new federal substantive standard by which to assess the validity of the local law. Rather, the limited focus is on the nature of the evidence before the local zoning board and whether it is substantial. The Ninth Circuit found that it "may not overturn the Board's decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence (i.e., more than a 'scintilla' but not necessarily a preponderance)." *Id.* at 725.

> The existence of "substantial evidence" in the record—as traditionally understood in the context of federal administrative law—is the standard against which federal courts consider whether a zoning board acted in conformity with the relevant local laws. So, for example, if the terms of a local zoning ordinance allow a zoning board to deny a permit based on *less* than substantial

evidence, or *no evidence* at all, and a permit is denied on that basis, the record would lack substantial evidence to justify the decision. Federal review is limited to this evidentiary inquiry. *See id.* at 724 ("[W]e must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations."); *ATC Realty, LLC v. Town of Kingston,* 303 F.3d 91, 94 (1st Cir. 2002) ("The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable [local] zoning requirements."). The "substantial evidence" standard constructs a floor below which the justification for denying a permit cannot fall—if it does, the board's decision would violate § 332(c)(7)(B)(iii).

Though this court is interpreting state substantive law, it applies the familiar substantial-evidence standard, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB.,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). As this court noted in *Telespectrum,* we "look to whether the agency explained any credibility judgments it made and whether it gave reasons for crediting one piece of evidence over another" and "examine the evidence as a whole, taking into account whatever in the record fairly detracts from its weight." *Telespectrum,* 227 F.3d at 423.

*Id.* at 798-99 (emphasis in original).

Finally (and perhaps most importantly), the Sixth Circuit has emphasized that "[s]ubstantial evidence should be substantiated." *Id.* at 800. "[G]eneralized objections" and allegations that a tower "would be bad for the community, would not be aesthetically pleasing, or would be otherwise objectionable" are "not enough." *Id.* at 801. "There must be evidence. And not just any evidence – evidence

that is *substantial*.  And substantial evidence must be substantiated by something."
*Id.* (emphasis in original).

**2**

A review of the ZBA's reasons for upholding the denial of PI's SLP application reveals that the ZBA's decision was not supported by substantial evidence.  Those reasons were described in the motion put forward by ZBA member Hank Anderson and approved by the ZBA. (*See* Admin. R., ECF No. 14-13, PageID.650-652.)  The Court will address each section of the motion below. *See T-Mobile Cent.,* 691 F.3d at 799-804 (identifying the reasons for denial listed in the municipality's written decision and reviewing those reasons one at a time).

**a**

The first four paragraphs of the motion recounted the history of the Tower Ordinance. (*See* Admin. R., ECF No. 14-13, PageID.650-651.)  They provided as follows:

> 1. Sec. 76-530(b) of the zoning ordinance provides that wireless communication towers, antennas and assessor facilities are permitted only as a special land use.
>
> 2. Prior to September 2019, sec 76-530(b) of the zoning ordinance provided that wireless communication towers, antennas and accessory facilities shall be permitted only as a special land use in the light and general manufacturing districts and in the recreational district.
>
> 3. Prior to September 2019, wireless communication towers were not permitted in any residential or

27

commercial districts. The prohibition of cellular towers in residential districts was based, in part, on the negative aesthetic impacts of the height of the towers and their close proximity to residences.

4. In September of 2019 the zoning ordinance was amended (i) to allow tower locations within a commercial district when they are located adjacent to an industrial district or an unbuildable area and (ii) to encourage cell towers and accessory facilities on "suitable" township owned property.

> a. With respect to wireless communication towers on commercially zoned property, the ordinance amendment permits towers as a special land use when they are located adjacent to an industrial district or an unbuildable area or in an area "so located on the commercial site as to not adversely affect the commercial development area or any neighboring residential areas."

> b. The ordinance amendment also encourages towers on "suitable" township owned property. The word "suitable" is a qualifies which clearly indicates that not all township owned property will be appropriate for the location of cell towers.

> c. Read in its entirety the zoning ordinance amendment clearly did not envision the location of wireless communication towers in residential districts, whether the property is privately or township owned.

(*Id.*)

These paragraphs of the motion reveal that the ZBA misunderstood, and/or disagreed with, the Tower Ordinance. The motion stressed that the 2019 amendment to the Tower Ordinance "clearly did not envision the location of wireless

communication towers in residential districts, whether the property is privately or township owned." (Admin. R., ECF No. 14-13, PageID.651.)  But that amendment provided that a tower *could* be built on Township-owned property in *any* district – *including* a residential district. *See* Tower Ordinance § 76-530(b)(8)(4) (Admin. R., ECF No. 14-3, PageID.345-346) (explaining that "the Township has authority to approve a new tower on Township property, regardless of the zoning district"). Indeed, as the Township's attorney confirmed for the Court, the Board amended the Tower Ordinance in 2019 to clarify that a wireless communications tower *could* be built on Township-owned property in a residential district.  In addition, the Tower Ordinance expressly "recognize[s]" that a tower may need to be built "in a location which is not within one of the predetermined districts" even where such construction would have an "adverse impact" upon a "neighborhood." Tower Ordinance § 76-530(a)(2) (Admin. R., ECF No. 14-3, PageID.353).  Moreover, the Township's own retained planning consultants confirmed that the placement of PI's proposed tower in a residential district *was* consistent with the Tower Ordinance.  The first four paragraphs of the motion thus confirm that the foundation of the ZBA's analysis – its belief that the Tower Ordinance did not envision wireless communication towers on Township-owned property in residential districts – is fundamentally inconsistent with the Tower Ordinance.  Accordingly, the ZBA failed to act "in conformity with"

that ordinance when it rejected PI's SLP application. *T-Mobile Cent.*, 691 F.3d at 799.

The first four paragraphs of the motion also included several mistakes of fact that revealed a further lack of understanding concerning the Tower Ordinance.  For example, paragraphs 3 and 4 of the motion provided that (1) "prior to September 2019, wireless communication towers were not permitted in any … commercial district;" and (2) the 2019 amendment to the Tower Ordinance revised the ordinance to allow for construction of a tower in commercial districts. (Admin. R., ECF No. 14-13, PageID.650-651.)  But even before the 2019 amendment to the Tower Ordinance, the ordinance provided that "[t]ower locations within a commercial district *may be considered* as a special land use when they are located adjacent to an industrial district or an unbuildable area, such as a wetland or floodplain, or area so located on the commercial site as to not adversely affect the commercial development area or any neighboring residential areas."  Tower Ordinance § 76-530(b)(4)(a) (emphasis added) (repealed September 2019) (Admin. R., ECF No. 14-3, PageID.355).  The motion also provided that the Tower Ordinance was amended in September 2019 to "encourage cell towers and accessory facilities on 'suitable' Township owned property." (Admin. R., ECF No. 14-13, PageID.651.)  That too was wrong.  Even before the 2019 amendment, the Tower Ordinance provided that it "strongly encourage[d] the development of necessary towers on suitable

30

Township-owned property." Tower Ordinance § 76-530(b)(4)(a) (repealed September 2019) (Admin. R., ECF No. 14-3, PageID.355).  The factual mistakes underpinning the ZBA's understanding of the Tower Ordinance underscore that the ZBA's decision was not supported by substantial evidence.

<strong>b</strong>

The fifth paragraph of the motion stated that "the township owned property on which the applicant requests permission to construct a wireless cell tower and accessory facilities is not suitable for the proposed use." (Admin. R., ECF No. 14-13, PageID.651.)  The paragraph next listed four facts about the property and then drew two conclusions:

a.  The proposed facility will include a 110' tall monopole tower with a 5' lightning rod for a 115' maximum overall height.

b.  The property is entirely surrounded by one and two story single family homes.

c.  The existing DPW pump station is only two stories in height.

d.  The fire station adjacent to the property has been abandoned and no longer in use.

e.  The proposed construction is completely out of character with the surrounding neighborhood.

f.  [… T]he zoning ordinance amendment in 2019 which encourages cell towers on suitable township owned property is not consistent with the zoning ordinances restriction of such

> facilities to light and general manufacturing
> districts, commercial districts and the recreation
> district. The zoning ordinance amendment was
> not intended to encourage cell tower facilities in
> residential zones. The amendment was simply a
> recognition that certain township owned
> properties may be considered when the property
> is not located in manufacturing, commercial and
> recreational areas.

(*Id.*, PageID.651-652.)  For several reasons, the conclusions in sub-paragraphs 5(e)

and 5(f) are not supported by substantial evidence.

### i

First, sub-paragraph 5(e)'s conclusion that PI's proposed tower is not a good

fit for the Jefferson Avenue Property conflicts with the Township's own prior

assessments of the tower.  As explained in detail above, employees from the

Township's Planning Department and Emergency Services Department helped PI

locate the Jefferson Avenue Property and concurred in PI's conclusion that the

Jefferson Avenue Property was the best location for the tower.  In addition, the

Township's outside planning consultants determined that the proposed tower

substantially complied with the Township's zoning ordinances.  More importantly,

the Board approved the Lease which (1) granted PI the right to build its tower on the

Jefferson Avenue Property and (2) committed the Township to assisting PI in its

effort to "obtain[] … all licenses and permits required for [PI's] use" of the property.

(Lease at ¶4, ECF No. 17-2, PageID.735.)  The Board also rebuffed a spirited effort

32

to rescind the Lease even after it heard opposition to the tower from neighboring residents.

Simply put, it is difficult, if not impossible, to reconcile sub-paragraph 5(e)'s conclusion that the tower is "out of character with the surrounding neighborhood" with the Township's prior conclusion that the site *was* an appropriate site – and indeed, was the best location in the Township for – PI's proposed tower.[7]  Indeed, the Township does not even attempt to reconcile this discrepancy in its briefing on whether there was substantial evidence to deny the SLP.  That briefing does not mention the Board's approval of (and refusal to rescind) the Lease, the planning consultants' opinion that the tower substantially complied with the Township's zoning ordinances, and/or the role of the Township's own employees in selecting the Jefferson Avenue Property. (*See*, *e.g.*, Township Resp., ECF No. 18, PageID.789-794.)

---

[7] The Lease did require PI to obtain an SLP from the Planning Commission for its proposed tower.  But that requirement does not undermine the Court's conclusion that the Lease is evidence that the Board considered the Jefferson Avenue Property to be an appropriate location for the tower.  Nor does it reflect a decision by the Board to defer to the Planning Commission (and ultimately the ZBA) the question of whether the Jefferson Avenue Property was an appropriate site.  As explained above, the Tower Ordinance requires that *every* application to construct a wireless communications tower go through the SLP process. *See* Tower Ordinance §§ 76-530(a)(1); 76-530(b)(8) (Admin. R., ECF No. 14-3, PageID.345-346, 353).  Thus, the Lease had to include the SLP provision.

**ii**

Second, the reasoning in sub-paragraph 5(e) conflicts with the Tower Ordinance. In that sub-paragraph, the ZBA concluded that PI's proposed tower is "completely out of character with the surrounding neighborhood" because, as noted in sub-paragraph 5(b), the neighborhood consists of one- and two-story single-family homes. But the Tower Ordinance *allows* towers on Township-owned properties in *all* residential districts. *See* Tower Ordinance § 76-530(b)(8) (Admin. R., ECF No. 14-3, PageID.345-346); *see also* Tower Ordinance § 76-530(a)(2) (Admin. R., ECF No. 14-3, PageID.353) ("recogniz[ing]" that a tower may have to be built "in a location which is not within one of the predetermined districts or zones"). Thus, the fact that the surrounding areas are residential, standing alone, could not be a basis for denying PI's SLP application. Indeed, the ZBA's decision to deny PI's SLP application based solely upon the fact that PI's proposed tower (on Township-owned land) was surrounded by single-family homes effectively negated the provision of the Tower Ordinance allowing the placement of towers on Township-owned property in residential districts. Accordingly, the decision is not supported by substantial evidence. *See T-Mobile Cent.,* 691 F.3d at 799 (explaining that application of the substantial evidence test ensures that "a zoning board acted in conformity with the relevant local laws").

34

The Township counters that sub-paragraph 5(e) was supported by substantial evidence because many residents spoke or wrote in opposition to the placement of PI's tower near the adjacent residences. (*See* Township Resp., ECF No. 18, PageID.780, 783, 792-793.)  The Court disagrees.  Many of the Township residents who opposed the construction of the tower did so on the general ground that a tower should not be built in a residential area.  For example, George Delanuez, who represented the largest group of residents who addressed the Planning Commission (a homeowners association comprised of 84 property owners and 168 total tax-paying lots), said that if a tower "must" be built, it should be built "away from homes." (Admin. R., ECF No. 14-5, PageID.413.)  Likewise, resident Nancy Zydell told the Planning Commission that "putting [the proposed tower] in a residential [district] made no sense to [her]," and she recommended that the tower be built in "a more rural place." (*Id.*, PageID.414.)  Finally, resident Tom Hough disagreed with "put[ting] a cell tower in this area" (*i.e.*, a residential area), and he told the Planning Commission that he "thought [PI] should look for a commercial site [for the tower]" instead.[8] (*Id.*)  The opinions of these residents do not constitute substantial evidence because they reflect a categorical view – *i.e.*, that towers do not belong in residential

---

[8] While the comments identified above were made during the January 21, 2020, Planning Commission meeting, the minutes from that meeting were included in the packet of materials presented to the ZBA. (*See* Admin. R., ECF No. 14-11, PageID.586-588.)

areas – that is inconsistent with the provision of the Tower Ordinance allowing

towers on Township-owned land in residential areas.[9]

---

[9] Residents also raised several other concerns about PI's proposed tower, but none constitute substantial evidence justifying the ZBA's decision.  For example, some residents complained that the construction of the tower would decrease their property values. (*See*, *e.g.*, Admin. R., ECF No. 14-5, PageID.648-649).  But there is no evidence that the ZBA relied upon (or found credible) any evidence concerning the impact of PI's tower on property values when it upheld the denial of PI's SLP application.  The motion approved by the ZBA describes several requirements of the SLP Ordinance that PI purportedly failed to satisfy, but it does not include any finding by the ZBA that the proposed tower would negatively impact surrounding property values. (Admin. R., ECF No. 14-13, PageID.651-652.)  Indeed, the motion never mentions property values at all.  In that regard, the ZBA's decision stands in sharp contrast to the Planning Commission's initial decision denying PI's SLP.  That decision included a finding that PI had not "me[t]" its "burden" to show that the proposed tower would not negatively impact surrounding property values. (*See* Admin. R., ECF No. 14-7, PageID.430.)  Next, other residents said that the existence of the tower raised unidentified "health" and "environmental" concerns. (*See*, *e.g.*, Admin. R., ECF No. 14-5, PageID.648).  But the Act bars municipalities from prohibiting the construction of wireless communications towers based upon perceived environmental and/or health effects. *See* 47 U.S.C. § 332(c)(7)(B)(iv); *Telespectrum, Inc. v. Public Service Com'n of Kentucky*, 277 F.3d 414, 424 (6th Cir. 2000) ("[W]e recognize that concerns of health risks due to the emissions may not constitute substantial evidence in support of denial by statutory rule").  Moreover, other residents said that they were concerned PI's proposed tower "could fall on [their] home[s]." (Admin. R., ECF No. 14-13, PageID.649.)  But there is no evidence in the record that PI's proposed tower was unsafe, and the ZBA did not mention the possibility of the tower falling in its motion.  Finally, a limited number of residents did raise specific aesthetic concerns about how the proposed tower could affect the particular neighborhood around the tower. (*See, e.g.*, Admin. R., ECF No. 14-11, PageID.637 (referring to the tower's impact on the "scenic areas … around the lake").)  But for all of the reasons explained throughout this Opinion and Order, on this record, these isolated specific aesthetic concerns raised by a limited number of residents do not constitute substantial evidence sufficient to salvage the ZBA's deeply-flawed decision.

The decision in *Sprint Spectrum, L.P. v. Charter Township of Brandon,* 563 F.Supp.2d 697 (E.D. Mich. 2008), is instructive in this regard.  In that case, a wireless service provider sought to locate a tower in the Charter Township of Brandon, Michigan.  The property was in the Rural Estates zoning district.  Towers were permitted in that zoning district as "a special land use that required permission from the township's planning commission." *Id*. at 700. When the provider sought permission to construct its tower, "far more than a mere handful of nearby property owners voiced their opposition to [the] proposal." *Id.* at 708.  These property owners complained that the tower would, among other things, upset "the particularly rural character of the neighborhood." *Id.*   Based in part upon those complaints, the township denied the special use application.

District Judge Gerald E. Rosen held that the residents' complaints "d[id] not constitute substantial evidence in support of the Township's decision." *Id*. at 709. He concluded that the "force" of the complaints "was considerably blunted by the Township's own determination, through its zoning ordinance, that [wireless communications towers] *may* be placed on property in the Rural Estates district" so long as certain specified requirements were met. *Id*. (emphasis added).  He further determined that since the township had "in essence, codified" towers as permitted uses in the Rural Estates district, it could not deny permission to construct a tower in that district based solely upon residents' complaints that the tower was "not in

harmony with the surrounding Rural Estates properties." *Id*. at 709.  He stressed that if the township had come to conclude that wireless communications towers were "flatly incompatible with a Rural Estates district and should be placed elsewhere, it must amend its zoning ordinance to reflect this change in policy." *Id*. at 710.

Here, as in *Sprint Spectrum*, opposition to PI's proposed tower on the ground that it was in a residential district was "considerably blunted" by the fact that the Tower Ordinance permitted the placement of the tower (on the Township-owned property) in that district.  That opposition therefore did not amount to substantial evidence supporting the denial of PI's SLP application.  Moreover, like the township in *Sprint Spectrum*, if the Township and its residents have come to determine that wireless communications towers are flatly incompatible with residential districts under all circumstances, then the Township must change the Tower Ordinance to reflect that determination.  With the current Tower Ordinance in place, the Township cannot reject towers on Township-owned property in residential districts on the sole, generalized basis that the property is surrounded by residences. *See id.*

The Township insists that *Sprint Spectrum* is distinguishable.  It contends:

> Here, the Township's Zoning Ordinance § 76-530 does not have the same backdrop as *Sprint Spectrum*. There is no express authorization of towers in residential areas – it is conditioned on it being "suitable" and "not adversely affect[ing] . . . any neighboring residential areas." *See* § 76-530(8). The conditional nature of § 76-530(8) gives weight to the residents' strong opposition here as

> substantial evidence the tower is not "suitable" and is "adversely affecting" surrounding residential area.

(Township Resp., ECF No. 18, PageID.793.)  For at least two reasons, the Court concludes that *Sprint Spectrum* cannot reasonably be distinguished on these grounds. First (and most importantly), contrary to the Township's contention, the Tower Ordinance *does* "expressly authorize[]" the construction of a wireless communications tower on the Township-owned property at issue here.  As explained in detail above, the Tower Ordinance specifically authorizes the construction of a tower on Township-owned property in *any* district, including residential districts, and the Jefferson Avenue Property is Township-owned property.  Second, the Tower Ordinance is not "conditional" in the manner suggested by the Township.  The "suitable" modifier from the Tower Ordinance cited by the Township describes Township-owned property on which towers are "strongly encourage[d]" to be developed.  Tower Ordinance § 76-530(b)(8)(4) (Admin. R., ECF No. 14-3, PageID.346).  The term "suitable" is not used in the section of the Tower Ordinance cited by the Township as a term of limitation or as a condition.  Moreover, the Tower Ordinance's requirement that a tower not "adversely affect[] … any residential areas" appears in the portion of the ordinance concerning the placement of towers in *commercial* districts, not on Township-owned property in residential districts. *Id.* The Court remains persuaded that *Sprint Spectrum* helps to illustrate the lack of substantial evidence supporting the ZBA's decision.

39

### iii

Finally, sub-paragraph 5(f) further reveals that the ZBA did not act in conformity with the Tower Ordinance.  That sub-paragraph shows that the ZBA's denial of PI's application was motivated by the ZBA's disapproval of the 2019 amendment to the Tower Ordinance.  The ZBA said that the portion of that amendment allowing towers on Township-owned property in any zoning district was "not consistent" with the other portions of the Tower Ordinance that limit towers to non-residential districts. (Admin. R., ECF No. 14-13, PageID.652.)  But the ZBA's disagreement with the governing ordinance cannot constitute substantial evidence that justifies the denial of PI's SLP application. *See T-Mobile Cent., LLC,* 691 F.3d at 799 (explaining that application of the substantial evidence test ensures that "a zoning board acted in conformity with the relevant local laws").

Sub-paragraph 5(f) also perpetuates the factual error that infected the earlier paragraphs.  That sub-paragraph repeats the mistaken belief that the 2019 amendment to the Tower Ordinance was the first time that the ordinance encouraged the placement of towers on suitable Township-owned property.  As explained above, that is not so.

### c

Paragraphs 6 and 7 of the motion provide as follows:

> 6. Sec 76-482 of the zoning ordinance provides that in order to approve a special land use application, there must

be an affirmative finding with respect to each of the eight standards set forth in sec 76-482(1). In my view, the proposed cell tower facilities are not of such location, size and character that they will be in harmony with the appropriate and orderly development of the surrounding residential neighborhood.

7. Because that applicant has not satisfied all of the special land use standard set forth in 76-482(1) of the zoning ordinance, the special land use request should be denied.

(Admin. R., ECF No. 14-13, PageID.652.)

These paragraphs also lack substantial evidence to support the denial of PI's SLP application. Paragraph six states that PI's proposed tower will not "be in harmony with the appropriate and orderly development of the surrounding residential neighborhood," but there is no evidence in the administrative record that there is any "development" occurring (or even contemplated) in the surrounding residential neighborhood. If anything, the evidence in the record suggests that the surrounding areas have already been completely developed – as residential areas. Thus, the record does not contain "substantial evidence" that the tower would interfere with the "development" of the adjacent areas. The final sentences in these paragraphs merely "parrot[] the language of the [Tower O]rdinance" and thus do not constitute substantial evidence supporting the denial of PI's SLP application. *T-Mobile Cent.*, 691 F.3d at 801 ("Merely repeating an ordinance does not constitute substantial evidence").

## C

While the Court has concluded that the Township's decision to deny PI's SLP application cannot withstand scrutiny under the Act, the Court wishes to underscore the narrowness of its ruling. The Court concludes only that on this record – *i.e.*, where the Board approved placement of the tower on the Jefferson Avenue Property; where the Township's consultants confirmed that PI's proposed tower was an appropriate use for the property; where the ZBA's decision rested upon a misunderstanding of, and/or disagreement with, the Tower Ordinance; where the ZBA's reasoning was inconsistent with the Tower Ordinance; and where much of the residents' opposition rested upon general hostility to the placement of wireless communications towers on Township-owned residential property approved for such towers under the Tower Ordinance – the denial of PI's SLP application cannot stand. Had the Township proceeded differently at various points during this process, it may have been possible to deny PI's SLP application in a decision that could have been supported by substantial evidence.

## V

Having determined that the Township's denial of PI's SLP application was not supported by substantial evidence and therefore violated the Act, the Court must next determine the proper remedy. Ordinarily, the proper remedy for a denial of permission to construct a tower that violates the Act would be an injunction

42

compelling a municipality to allow construction of the proposed tower. *See, e.g.,* *New Par*, 301 F.3d at 399-400 (recognizing that "this court has previously concluded … that injunctive relief is an appropriate remedy for [] violations [of the Act]" and affirming issuance of injunction); *Tennessee ex rel. Wireless Income    Properties, LLC v. City of Chattanooga*, 403 F.3d 392, 399 (6th Cir. 2005) (holding that district court abused its discretion when it failed to issue injunction after concluding that city had violated the Act and "recogniz[ing] that an injunction requiring the issuance of a permit ordinarily is a proper remedy when a governmental body has denied a permit [under the Act] without substantial evidence supporting the denial"); *New Par v. Charter Twp. of Brighton*, 452 F Supp 3d 663, 678 (E.D. Mich. 2020) (holding that township violated the Act, granting wireless company summary judgment, and issuing "an injunction ordering the [t]ownship to grant [the wireless company's] two applications and issue the necessary permits").  PI may ultimately be entitled to such an injunction.

However, under the unique procedural posture of this case, the Court declines to grant injunctive relief at this time.  It appears that there may be a dispute between the parties as to whether the Lease remains in effect and whether PI retains any interest in the Jefferson Avenue Property.  Indeed, in PI's summary judgment motion, PI asks the Court to issue a "declaratory judgment" that the Lease "remains in full force and effect." (Mot., ECF No. 19, PageID.727-731.)  The apparent dispute

over whether the Lease remains in effect weighs against making a final decision now on whether to issue an injunction because if the Lease does not remain in effect, PI may not have a right to the injunctive relief it seeks.  For that reason, the Court concludes that it is most appropriate to resolve the dispute concerning whether the Lease remains in effect and whether PI retains any interest in the Jefferson Avenue Property before deciding on an appropriate remedy here.

The Court is not certain that it can resolve the question of whether the Lease remains in force on the administrative record alone.  The resolution of that question may be most appropriately resolved after the development of a factual record through discovery.  The Court will hold a status conference to discuss next steps for developing an appropriate factual record and for resolving the outstanding dispute about the status of the Lease.  Once the Court resolves the dispute concerning the effectiveness of the Lease, the Court will decide on an appropriate remedy for the Township's violation of the Act.

## VI

For all of the reasons explained above, PI's motion for partial summary Judgment (ECF No. 17) is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART** as follows:

- Summary judgment is **GRANTED** on PI's claim that the Township violated the Act by denying PI's SLP application in a final decision that was not supported by substantial evidence; and

- PI's request for a declaratory judgment that the Lease remains in full force and effect is **DENIED WITHOUT PREJUDICE** pending further potential development of the factual record through discovery.

The Court will now convene a status conference with counsel for both parties to discuss next steps in this action.

**IT IS SO ORDERED**.

                                        s/Matthew F. Leitman
                                        MATTHEW F. LEITMAN
                                        UNITED STATES DISTRICT JUDGE
Dated:  December 8, 2021


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 8, 2021, by electronic means and/or ordinary mail.

                                        s/Holly A. Monda
                                        Case Manager
                                        (810) 341-9764